Barbara **ALLEN**, et al., Plaintiffs,

v.

**HONEYWELL RETIREMENT EARNINGS PLAN**, et al., Defendants.

**No. CV–04–424–PHX–ROS.**

United States District Court, D. Arizona.

July 8, 2005.

---

Daniel Lee Bonnett, Jennifer Lynn Kroll, Susan Joan Martin, Martin & Bonnett PLLC, Phoenix, AZ, for Plaintiffs.

Amy Promislo, Azeez Hayne, Michael L. Banks, William J. Delany, Morgan, Lewis & Bockius LLP, Philadelphia, PA, David B. Rosenbaum, Dawn L. Dauphine, Osborn Maledon PA, Phoenix, AZ, John Ferreira, Morgan, Lewis & Bockius LLP, Pittsburgh, PA, for Defendants.

## ORDER

SILVER, District Judge.

On March 31, 2005, the Court issued an Order ruling on various pending Motions in this action and promising that a written opinion would follow.[1] This is that opinion. This is a putative class action brought under the civil enforcement provision of the Employee Retirement Income Security

---

1. The Court did not set oral argument be- cause the parties submitted memoranda thor-

Act ("ERISA"), 29 U.S.C. § 1132(a). Plaintiffs are former salaried employees of the Garrett Corporation, now part of Honeywell International, Inc. ("Honeywell"). They claim, among other things, that they have suffered reductions in accrued benefits as a result of various amendments to their retirement plans. Pending before the Court were Defendants' Motion to Dismiss the Complaint and Plaintiffs' Motion for Partial Summary Judgment. Also currently pending is Defendants' Motion to Dismiss the Amended Complaint, which incorporates Defendants' first Motion to Dismiss by reference and also seeks to dismiss Plaintiffs' new Count V. For the reasons stated below, the Court granted in part and denied in part both Defendants' Motion to Dismiss the Complaint and Plaintiffs' Motion for Partial Summary Judgment. By this Order, the Court also applies its ruling on Defendants' Motion to Dismiss the Complaint to Defendants' Motion to Dismiss the Amended Complaint. Additionally, it grants Defendants' request to dismiss Count V.

## BACKGROUND

### A. The Pre–1984 Garrett Retirement and Severance Plans

Unless otherwise indicated, the facts set forth in the following sections are undis-

puted or incontrovertible.[2] In 1960, the Garrett Corporation ("Garrett") established the Supplemental Retirement and Severance Program for Employees of the Garrett Corporation, consisting of the Garrett Retirement Plan and the preexisting Garrett Severance Plan (collectively, the "Garrett Plans").[3] (*See* Garrett Retirement Plan, attached as Exh. A. to Promislo Decl. [Doc. # 16]; Garrett Severance Plan, attached as Exh. B. to Promislo Decl.; Promislo Decl. Exhs. K & O.).

The Retirement Plan was funded by Garrett and provided eligible participants with a traditional defined benefit pension, i.e., a monthly pension payable during retirement based on the employee's service and compensation history as of the date of retirement. (DSOF ¶ 7; Garrett Retirement Plan §§ 3.1, 4.1(b).) The Severance Plan was also funded by Garrett, but worked differently. (Garrett Severance Plan § 3.2.) It provided for an individual account (a "Secured Benefit Account") for each participant and for benefits based solely on the amount contributed to the account.[4] (*Id.* §§ 4.1–4.3.)

### B. The Floor–Offset Arrangement

The Garrett Plans were coordinated in a floor-offset arrangement. (*See* Garrett

---

oughly discussing the law and evidence in support of their positions, and oral argument would not have aided the Court's decision. *See Mahon v. Credit Bur. of Placer County, Inc.*, 171 F.3d 1197, 1200 (9th Cir.1999), *modified*, No. 97–17298, 1999 U.S.App. LEXIS 8016.

**2.** This Order does not consider the evidence stricken in the Court's concurrently filed Order ruling on the parties' Motions to Strike.

**3.** The Garrett Corporation was acquired by the Signal Companies, Inc. in 1964. (Promislo Decl. Exh. O. at 2 n. 2.) On September 30, 1987, the Garrett Corporation, the Signal Companies, Inc., and Allied Corporation merged into Allied–Signal, Inc., which later

changed its name to AlliedSignal Inc. (Defendants' Separate Statement of Facts ("DSOF") ¶ 1 [Doc. # 32].) On December 2, 1999, Honeywell, Inc. became a wholly-owned subsidiary of AlliedSignal Inc., and AlliedSignal Inc. changed its name to Honeywell International Inc. (*Id.* ¶ 2.)

**4.** In this respect, the Severance Plan resembled a defined contribution plan; however, unlike a true defined contribution plan, the Severance Plan did not allocate income, gains, losses, or forfeitures to participants accounts. (Plaintiffs' Reply Statement of Facts ("PRSOF") ¶ 14 [Doc. # 52]; 29 U.S.C. § 1002(34).) The distinction is not material here.

Retirement Plan § 4.1(a).) A floor-offset arrangement consists of two separate plans, a defined benefit and defined contribution plan. *See* Regina T. Jefferson, *Rethinking the Risk of Defined Contribution Plans*, 4 Fla. Tax Rev. 607, 669 (2000). The defined benefit plan operates as the "floor" plan, while the defined contribution plan is the "base plan." *Id.* If the base plan provides a benefit at least equal to the minimum established under the floor plan, the participant receives the defined contribution account balance as her retirement benefit. *Id.* at 669–70. In that case, no benefit is paid from the floor plan. *Id.* at 670. "If, however, the defined contribution plan provides less than the minimum benefit established under the floor plan, as a result of investment performance or inflation, for example, payments will be made from the floor plan to offset the shortfall in the base plan benefit." *Id.*

An example from the Defendants' brief, using a hypothetical 65 year-old retiree, shows how the floor-offset arrangement worked under the Garrett Plans. (*See* Defs.' Mot. to Dismiss at 4 [Doc. # 15].) Under the Garrett Retirement Plan, an employee who retired at age 65 would have been eligible to receive an immediate annuity benefit from the Retirement Plan determined by one of several formulas taking into account the employee's years of service and compensation history (i.e., the greatest of the Career Average Benefits, Final Average Benefits, or Minimum Benefits formulas, as those formulas are defined in the Plan). (Garrett Retirement Plan § 4.1(b).) The Retirement Plan referred to this annuity as the "Objective Retirement Income." If the hypothetical employee's Objective Retirement Income equaled $1000.00 per month, this figure would have operated as a "floor" or minimum benefit. (*See id.*)

To determine how the actual retirement benefit was calculated, however, one had to look at the balance of the Secured Benefit Account and the provisions in the Garrett Retirement Plan that incorporated the Secured Benefit Account. (Garrett Retirement Plan § 4.1.) Assume, for instance, that the same hypothetical 65 year-old employee had a Secured Benefit Account in the amount of $50,000.00. The Garrett Retirement Plan required that the $50,000.00 amount be offset against the employee's Objective Retirement Income. (*Id.* § 4.1(a).) But to do that, the $50,000.00 amount had to be converted to an annuity payable at the same time—the "Potential Retirement Income"—so that a comparison with the Objective Retirement Income could be made. (*See id.* § 4.1(c).)

To make that conversion, the Retirement Plan divided the amount in the Secured Benefit Account by a conversion factor of $153.51. (*Id.* § 4.1(c).) The conversion factor is set forth in Exhibit B to the Retirement Plan. (*See id.*) Using this methodology, the $50,000.00 in the hypothetical employee's Secured Benefit Account would have been equal to an annuity of roughly $326.00 per month. Under the terms of the Retirement Plan, that amount would have then been offset against the Objective Retirement Income, resulting in the participant receiving a total retirement benefit (referred to as the "Normal Retirement Benefit") as follows: an annuity from the Retirement Plan in the amount of $674.00 per month ($1000.00 per month minus the $326.00 per month annuitized value of the Secured Benefit Account), plus the $50,000.00 balance in the Secured Benefit Account. (*Id.* § 4.1(a).)

The example above addresses the situation where the employee's Secured Benefit Account, when converted to a monthly annuity, was worth less than the Objective Retirement Income annuity. If the annuitized value of the Secured Benefit Account

was worth more than the Objective Retirement Income annuity, then the participant simply received the amount in the Secured Benefit Account.[5] (*Id.* § 4.1.) This effectively ensured that the participant received the greater of the Objective Retirement Income and Potential Retirement Income. In all cases, however, the Objective Retirement Income acted as a floor—that is, the total benefit payable after applying the Secured Benefit Account offset could never be less than the participant's Objective Retirement Income.

Sometimes participants retire or separate from employment before reaching age 65. In such cases, the Retirement Plan included an additional step to determine the participant's Normal Retirement Benefit. This is because the Retirement Plan defined its benefit as an annuity commencing at age 65, while the amount in the participant's Secured Benefit Account was determined at the participant's retirement or termination date. Assume that our hypothetical employee decided to retire at age 60 rather than age 65. To calculate the amount of the Secured Benefit Account offset, the Retirement Plan required the Secured Benefit Account to be projected forward from age 60 to 65 (enabling the projected Secured Benefit Account to be converted into an annuity payable at age 65). (Garrett Retirement Plan § 4.1(c).) The Retirement Plan used an interest rate to make this conversion (referred to as "Credited Interest"). It defined this rate as "3-1/2% per annum, compounded annually, or at such other rate as may be

determined by the Committee from time to time." (*Id.* § 1.3.)

Further, for those participants who had worked in excess of 35 years for the company, the Garrett Retirement Plan provided that the Secured Benefit Account offset would be reduced by a fraction, "the numerator of such fraction being 360 (420 in the case of participants terminating on and after November 1, 1976), and the denominator of such fraction being his completed months of Credited Service." (*Id.* § 4.1(c).)

## C. The Amendments to the Garrett Plans

By an amendment entitled "Amendment IV," the Garrett Severance Plan was amended, effective December 31, 1983, to provide for its merger with the Signal Companies, Inc. Savings and Stock Purchase Plan (the "Signal Savings Plan"). (Amend. IV to Garrett Severance Plan ¶ 4.) The Amendment provided a final benefit accrual date of December 31, 1983, and a complete discontinuance of any additional contributions to the Severance Plan by the employer as of that date. (*Id* ¶ 1.) It further provided that immediately after participants were credited with the final company contributions, any excess in the fair market value of the assets of the Plan over the value of the participants' Secured Benefit Accounts would be allocated to participants. (*Id.* ¶ 2.) This allocation increased the participants' Secured Benefit accounts by almost 50%. (DSOF ¶ 15.) Under the terms of the Amendment, each

---

**5.** Under the Retirement Plan, each participant was given the option of transferring all or part of his Secured Benefit Account balance to the Retirement Plan upon termination of employment. To the extent the account balance was transferred, the participant was not entitled to receive the account balance, but no offset would be applied in calculating his or her Normal Retirement Benefit. To the extent the account balance was not transferred, the participant was entitled to receive the account balance, but the offset would be applied in calculating his Normal Retirement Benefit. The decision to transfer all or part of the Secured Benefit Account balance to the Retirement Plan was made by each participant. *Id.* §§ 3.2, 4.1(a)(2) & (d).

participant in the Garrett Severance Plan who was eligible for an allocation on December 13, 1983 became 100% vested in the benefits under the Plan. (Amend. IV to Garrett Severance Plan ¶ 3.)

By another amendment entitled "Amendment IX," effective December 31, 1983, the Garrett Retirement Plan was amended to provide for its merger into the Signal Companies, Inc. Retirement Plan (the "Signal Retirement Plan"). The Amendment provided that after the merger, all benefits that were to be paid from the Garrett Retirement Plan would be paid under the Signal Retirement Plan solely in accordance with the provisions of the Signal Retirement Plan. (Amend. IX to Garrett Retirement Plan ¶ 4.) It also acknowledged that the Garrett Severance Plan was being merged into the Signal Savings Plan and stated that the benefits under the Signal Retirement Plan shall be "offset, using the assumptions set forth in the Signal Retirement Plan, by the value of each Participant's account in the [Signal Savings Plan] derived from his former account in the Severance Plan." (*Id.* ¶ 5.)

After December 31, 1983, the company ceased making new contributions to the Secured Benefit Accounts. (DSOF ¶ 18; PRSOF ¶ 18.) Effective January 1, 1984, participants' Secured Benefit Accounts were invested in a guaranteed investment contract in which an insurance company agreed to provide 12.3% interest for 25 years. (*Id.* ¶ 19; PRSOF ¶ 19.) To date, participants' Secured Benefit Accounts continue to earn interest at a rate of 12.3% per year. (DSOF ¶ 19.) Plaintiffs, however, correctly point out that since 1993, fees and expenses have been deducted from participants' Secured Benefits Account, slightly reducing the rate of return. (PRSOF ¶ 19.)

### D. The Signal Retirement Plan

On February 4, 1984, the Signal Retirement Plan was amended and restated, effective January 1, 1984, to admit former participants in the Garrett Retirement Plan who continued in active employment as new participants in the Signal Retirement Plan and to grant them past service credit for their years of participation in the Garrett Retirement Plan.[6] (Signal Retirement Plan §§ 1.16(a) & (h), 2.1(b), attached as Exh. E. to Promislo Decl.)

The Signal Retirement Plan provides that a participant who retires on or after his "Normal Retirement Date" (age 65) shall receive a "Normal Retirement Benefit" consisting of a monthly benefit. (*Id.* § 4.2(a).) Section 4.2(b) of the Retirement Plan defines the participant's Normal Retirement Benefit as "(i) 1.5% of his Average Final Compensation multiplied by his Credited Service, minus (ii) 1.5% of his Primary Social Security Benefit multiplied by his Credited Service (not in excess of $33\frac{1}{3}$ years)." (*Id.*) For participants who were participants in the Signal Retirement Plan on April 1, 1971, the excess over $60.00 under clause (ii) is disregarded. (*Id.* § 4.2(a)(iii).)

The Normal Retirement Benefit formula in § 4.2(b) is subject to certain exceptions, set forth in sections 4.2(c) through (k). Two of those exceptions are relevant here— §§ 4.2(c) and (e). Section 4.2(c) sets forth two alternative formulas for calculating a participant's Normal Retirement

---

**6.** The Court acknowledges that the Plaintiffs maintain that the Signal Retirement Plan was not effectively amended to include Garrett Corporation employees until 1985. (PRSOF ¶ 23 n. 1.) However, the Plaintiffs have not provided any specific evidence to support this conclusory assertion. *See Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir.1989) (conclusory allegations without evidentiary support are inadmissible). In any event, Plaintiffs admit that the distinction is not material to resolution of the Motions.

Benefit, subject to the exceptions in sections 4.2(d) through (k). Under § 4.2(c)(i), in the case of a participant who had his separation from service at the time he was either employed by Garrett or a few other listed companies,[7] the participant's Normal Retirement Benefit may not be less than "(a) $20.00 times his Credited Service, or (b) 1% of his Average Final Compensation multiplied by his Credited Service." (*Id.* § 4.2(b)(ii).) The parties refer to this formula as the "1% Minimum Benefits Formula." Under § 4.2(c)(ii), in the case of a participant not included in subsection (i), the participant's Normal Retirement Benefit may not be less than "1.25% of his Final Average Compensation multiplied by his Credited Service" (referred to by the parties as the "1.25% Minimum Benefits Formula").

The other relevant exception, set forth in § 4.2(e), provides that "the Normal Retirement Benefit provided under [§ 4.2(b)]" of a participant who held a Garrett Secured Benefit Account shall be offset by the value of the account balance not transferred to the Signal Retirement Plan. (*Id.* § 4.2(e)(i)(b).) For the purposes of calculating the offset, § 4.2(e)(i)(b) treats the portion of the participant's Secured Benefits Account that would have existed as of December 31, 1983 absent Amendment IV to the Garrett Severance Plan as earning a 1.75% semiannual interest rate (the "Assumed Rate") until the date the participant had his separation from service (the "Offset Calculation Date"). It then treats the remainder of the participant's Secured Benefits Account as earning a 7.5% annual interest rate from the Offset Calculation Date to the Normal Retirement Date. (*Id.*) Finally, it divides the sum of these two amounts by an interest conversion rate of 153.31 to reach the offset amount. (*Id.*) Unlike the Garrett Retirement Plan, Section 4.2(e)(i)(b) contains no fractional reduction in the offset for participants with 35 or more years of service.

Under § 4.2(c)(ii) of the Signal Retirement Plan, "[T]he 'Accrued Benefit' as of December 31, 1983 of any Employee or Former Employee who was a participant in any plan which merged with this Plan effective January 1, 1984 shall not be less than his 'Accrued Benefit' as of December 31, 1983 determined under the terms of such other plan ...." (*Id.* § 4.2(c)(ii).)

### E. The AlliedSignal Retirement Plan

The Signal Retirement Plan was amended and restated in 1993. The new plan, called the "AlliedSignal Retirement Plan," provided for a Secured Benefit Account offset to the minimum benefit formulas set forth in § 4.2(c) of the Signal Retirement Plan. (AlliedSignal Retirement Plan § 5.2(c), attached as Exh. Q. to Promislo Decl.) It also deleted the reference to "a participant who had his Separation from the Service at the time he was employed by ... The Garrett Corporation" in § 4.2(c)(i) of the Signal Retirement Plan and substituted the phrase "a Member who incurs a Termination of Service while employed by the Company's Garrett division." (Allied Signal Retirement Plan § 5.1(b)(2).)

### F. The Honeywell Retirement Earnings Plan

The AlliedSignal Retirement Plan was amended and restated in 2000. (*See* Honeywell Retirement Earnings Plan, attached as Exh. P. to Promislo Decl.) Unlike prior plans, the new plan provides that "[t]he Plan Administrator shall have full discretionary authority and power to con-

---

**7.** Signal, Signal Properties, Inc., Signal Landmark, Inc., and Industrial Turbines International, Inc.

trol and manage all aspects of the Plan . . . ." (*Id.* § 12.02.)

### G. Internal Claims Review Process and Procedural History

Prior to this litigation, Plaintiffs asserted their claims internally, as required by the plan documents. The plan administrator granted one of Plaintiffs' claims and denied the rest. On March 1, 2004, Plaintiffs filed a Class Action Complaint in this Court alleging ERISA violations. After an extension of time, Defendants moved to dismiss on May 10, 2004. Plaintiffs moved for partial summary judgment on June 22, 2004. On October 14, 2004, Plaintiffs filed an Amended Complaint, which does not modify Plaintiffs' original claims, but merely adds a new Count V. Defendants have also moved to dismiss the Amended Complaint.

### DISCUSSION

### A. Motion to Dismiss Standard

■ For the purposes of the Defendants' Motion to Dismiss, the Court assumes that the facts alleged in Plaintiffs' Complaint are true, unless such allegations are contradicted by documents referenced in the Complaint. *See Steckman v. Hart Brewing, Inc.,* 143 F.3d 1293, 1295–96 (9th Cir.1998) (holding that a court "need not accept as true conclusory allegations which are contradicted by documents referred to in the complaint."). A Rule 12(b)(6) motion to dismiss will be granted where the plaintiff fails to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). Under Rule 12(b)(6), a complaint should not be dismissed unless the plaintiff can prove "no set of facts in support of his claim that would entitle him to relief." *Parks Sch. of Bus., Inc. v. Symington,* 51 F.3d 1480, 1484 (9th Cir.1995). For the purposes of a Rule 12(b)(6) motion, "[r]eview is limited to the contents of the complaint," *Clegg v. Cult Awareness Network,*

18 F.3d 752, 755 (9th Cir.1994). However, undisputed documents alleged or referenced in the complaint—like the plans at issue here—may be considered by the Court. *See Parrino v. FHP, Inc.,* 146 F.3d 699 (9th Cir.1998).

### B. Summary Judgment Standard

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Substantive law determines which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Also, the dispute must be genuine, that is, "the evidence [must be] such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

The party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e); *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Brinson v. Linda Rose Joint Venture,* 53 F.3d 1044, 1049 (9th Cir.1995). There is no issue for trial unless there is sufficient evidence favoring the non-moving party; if the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson,* 477 U.S. at 249–50, 106

S.Ct. 2505. Because "[c]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are jury functions, not those of a judge, ... [t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505.

### E. ERISA Overview

■ ERISA regulates pension benefits through statutory accrual, vesting, and notice requirements. *See* 29 U.S.C. §§ 1053–54. In addition to these statutory protections, when an employer imposes upon itself extra-ERISA obligations in its pension plans, contract law renders these extra-ERISA obligations enforceable. *Spacek v. Maritime Ass'n. I L A Pension Plan,* 134 F.3d 283, 288 (5th Cir.1998), *overruled on other grounds, Central Laborers' Pension Fund v. Heinz,* 541 U.S. 739, 124 S.Ct. 2230, 2236, 159 L.Ed.2d 46 (2004).

Plaintiffs bring their claims pursuant to 29 U.S.C. § 1132(a). Section 1132(a) provides a procedural mechanism for enforcing a plan participant's rights, whether based on ERISA's statutory protections, or on the federal common law of contracts. *Id.* Section 1132(a)(1)(B) provides that a participant may bring an action to recover "benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." Section 1132(a)(3) empowers a participant to bring an action for appropriate equitable relief to enforce ERISA or the terms of the plan to the extent relief is unavailable under other subsections of § 1132(a). *Varity Corp. v. Howe,* 516 U.S. 489, 515, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996).

### F. The Anti–Cutback Claims

■ Plaintiffs allege that the merger of the Garrett Retirement Plan into the Signal Retirement Plan reduced or eliminated their accrued benefits in violation of ERISA's anti-cutback rule, 29 U.S.C. § 1054(g), by retroactively increasing the interest rate used to project a portion of participant's Secured Benefit Account forward to age 65 for the purpose of calculating the Secured Benefit Account offset; adopting a Social Security offset attributable to years of service worked prior to introduction of that offset; and eliminating a Garrett Retirement provision requiring a fractional reduction to the Secured Benefit Account offset for participants with more than 35 years of service.[8] Bound by dispositive Ninth Circuit precedent, the Court grants summary judgment to Plaintiffs on these claims.

■ "Interpretation of ERISA, a federal statute, is a question of law subject to *de novo* review." *Spain v. Aetna Life Ins. Co.,* 13 F.3d 310, 312 (9th Cir.1993). As with Plaintiffs' other statutory claims, the Court conducts a *de novo* review to determine whether the plan administrator properly found no violation of ERISA. *See McDaniel v. Chevron Corp.,* 203 F.3d 1099, (9th Cir.2000) ("[W]e cannot defer to a plan administrator's construction of a federal statute ...."); *Penn v. Howe–Baker Eng'rs, Inc.,* 898 F.2d 1096, 1100 (5th Cir. 1990) ("We accord no deference to the [plan administrator's] conclusions as to the controlling law, which involve statutory interpretation.")

■ ERISA's anti-cutback rule provides, with certain exceptions not relevant here, that "[t]he accrued benefit of a participant under a plan may not be decreased

---

**8.** Plaintiffs also raise two additional anti-cutback challenges that are discussed separately in Section (K) below.

by an amendment of the plan." 29 U.S.C. § 1054(g)(1). The rule applies to the participant's basic accrued benefit, as well as to accrued early retirement benefits, retirement-type subsidies, and optional forms of benefits. 29 U.S.C. § 1054(g)(2). Such benefits may only be eliminated or reduced by amendment on a prospective basis, i.e., with respect to benefits that have not yet accrued. *See, e.g., Campbell v. BankBoston,* 327 F.3d 1, 8–9 (1st Cir. 2003) (holding that elimination of a future expected benefit that has not yet accrued does not constitute an ERISA violation).

This case is unique because Plaintiffs are willing to concede for the purposes of their Motion for Partial Summary Judgment that the Signal Retirement Plan's floor-offset formula applied as a whole gives them a greater net annual retirement benefit than the Garrett Retirement Plan's floor-offset formula applied as a whole. (*See* Pls.' Opp. to Defs.' Mot. to Dismiss and Pls.' Cross Mot. for Partial Summ. J. at 15 n. 16.) In other words, they admit that they are better off on the whole after the amendments than they were before. They contend, however, that the retroactive elimination or reduction of certain favorable components of the Garrett Retirement Plan floor-offset formula violates the anti-cutback rule. In essence, Plaintiffs want to have their cake and eat it too: they wish to keep all of the upward adjustments contained in the Signal Retirement Plan, while eliminating any of the downward adjustments.

Plaintiffs' anti-cutback claims turn on a common issue, namely, the proper interpretation of the term "accrued benefit" for the purposes of the anti-cutback rule. Plaintiffs contend that the individual features of a benefit formula itself—like the method for determining an offset—are accrued benefits that may not be retroactively decreased under *any circumstances* by a plan amendment. Thus, under Plaintiffs'

interpretation of the anti-cutback rule, an amendment retroactively eliminating a favorable component of a pre-amendment benefit formula decreases an accrued benefit in violation of the anti-cutback rule even if another amendment retroactively increases another portion of the formula and in the end gives the participant the same or higher net annuity.

Defendants argue that a participant's "accrued benefit" for the purposes of the anti-cutback rule is the product of the plan's benefit formula (taken as a whole) at any given snapshot in time—i.e., the participant's net annual benefit. Thus, under Defendants' construction of the anti-cutback rule, if there are two amendments, and one amendment retroactively increases an offset while another amendment retroactively increases the floor retirement benefit, such an amendment violates the anti-cutback rule only if the net dollar amount of the participant's period payment after the two amendments is lower than it would have been without the amendments.

If the Court were addressing this issue as a matter of first impression, it would adopt the Defendants' construction of the anti-cutback rule. First, this construction has common sense on its side. The anti-cutback rule was intended to prevent employers from "pulling the rug out from under" employees participating in a plan. *Williams v. Cordis Corp.,* 30 F.3d 1429, 1431 (11th Cir.1994). "[W]hen Congress enacted ERISA, it 'wanted to … make sure that if a worker has been promised a defined benefit pension upon retirement— and if he has fulfilled whatever conditions are required to obtain it—he actually will receive it.'" *Lockheed Corp. v. Spink,* 517 U.S. 882, 887, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996) (quoting *Nachman Corp. v. Pension Benefit Guar. Corp.,* 446 U.S. 359, 375, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980)). It is difficult to understand what injustice

or harm results when the upside of a post-amendment benefit formula outweighs or equals the downside.

Second, Defendants' interpretation is consistent with the statutory definition of "accrued benefit." The Garrett Retirement Plan and successor plans are defined benefit plans. ERISA defines an "accrued benefit," in the case of a defined benefit plan, as the "annual benefit commencing at normal retirement age." 29 U.S.C. § 1002(23)(1). A participant's "annual benefit commencing at normal retirement age," in turn, can sensibly mean nothing other than the *dollar amount* of the annuity at retirement—i.e., the product of the plan's benefit formula. That is what the participant receives and what he is concerned with when he attains normal retirement age—money, not intangible components of a benefit formula like an interest rate or a fractional reduction in an offset.

Third, the Defendants' position is consistent with the legislative history of the anti-cutback rule. The Retirement Equity Act of 1984 amended the anti-cutback rule to make clear that it applied to early retirement benefits and retirement-type subsidies. *Central Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 124 S.Ct. 2230, 2235, 159 L.Ed.2d 46 (2004). The Senate Report to the Act, S.Rep. No. 98–575, at 28–29, *reprinted in* 1984 U.S.C.C.A.N. 2547, 2574–2575, provides examples under which an amendment to a plan's benefit formula would violate the amended anti-cutback rule. The examples consistently speak of the participant's accrued benefit as the dollar amount of the participant's annual benefit immediately before the amendment. *Id.* at 29, 1984 U.S.C.C.A.N. 2547, 2575 ("A's accrued benefit at that time was an annual benefit of $3000."). Consistent with this understanding, they further suggest—as the Defendants do here—that no violation occurs where an amended formula leaves the participant with an annual benefit that is no less than before. *Id.* ("Under the bill, the plan amendment could not reduce A's accrued benefit below $3,000 . . . .").

Fourth, the Defendants' construction has the advantage of giving employers the flexibility to reexamine existing plans and adopt new benefit formulas that benefit, or at least do not harm, participants. As in this case, companies often merge or have a number of subsidiaries. When each company in the corporate umbrella has a separate retirement plan, the cost of administering many different retirement plans will be very high. Consolidation of the separate retirement plans into a single plan allows these administrative functions to be performed more efficiently. As long as the amended plan does not reduce the amount payable to participants under the unamended plans at the time they were amended, employees should have no cause to complain. ERISA certainly does not prohibit future increases in benefit accruals. Nor does it prohibit future decreases. *See, e.g., Aldridge v. Lily–Tulip, Inc. Salary Ret. Plan Benefits Comm.*, 40 F.3d 1202, 1211 (11th Cir.1994).

Further, an employer may for entirely appropriate reasons wish to convert from one form of retirement plan to another. In recent years, a number of companies have converted their traditional defined benefit plans to cash balance plans. Jayne E. Zanglein & Susan J. Stabile, *ERISA Litigation* 707 (2003). In traditional defined benefit plans, benefits are calculated based on years of service to the company and on an average of the employee's salary. *See Campbell*, 327 F.3d at 8. Under a cash balance plan, a participant has a hypothetical account that increases by earning annual credits that are typically based on a flat percentage of compensation. *Id.* The participant's retirement ben-

efit at any point in time is equal to the value of the account. *Id.*

There are a number of reasons why companies find cash balance plans more desirable than traditional defined benefit plans. Employers believe that cash balance plans are easier to understand and allow younger workers to accrue pension benefits at a greater amount and rate. Zanglein & Stabile, *supra*, 707. "Cash balance plans are also more portable than annuity-based plans, because they can be taken as a lump sum upon leaving the company." *Campbell*, 327 F.3d at 8. Therefore, "a move to a cash balance plan is one way for a company to attract younger and more mobile workers." *Id.* In addition, "if a company has an older workforce, a cash balance plan may be a cheaper plan to administer." *Id.* In a traditional defined benefit plan, "the largest benefits are earned in the years immediately preceding retirement." *Id.* "Because there is little time for interest to accrue, an annuity purchased to secure those benefits will be more expensive." *Id.* A cash balance plan awards benefits earlier in the employee's career and may thus be less expensive for employers. *Id.*

The conversion from a traditional defined benefit plan to a cash balance plan occurs by eliminating continued accrual of benefits under the old defined benefit plan, converting all previous accrued benefits to cash balance accounts by calculating the *dollar value* of the participants' benefits as of the date of the amendment, and then crediting those amounts to separate conversion accounts where they then earn interest. *See Campbell*, 327 F.3d at 4. If, as Plaintiffs assert, specific portions of a ben-

efit formula are themselves accrued benefits that may never be eliminated under any circumstances, then this conversion can never happen: the benefit formula under a cash balance plan is entirely different than the benefit formula under a traditional plan.

While the Ninth Circuit has not addressed the issue, no court has ever held that the mere conversion from a traditional defined benefit plan to a cash balance plan violates ERISA. In *Campbell*, 327 F.3d at 8–9—a First Circuit case—the plaintiff challenged the defendant's conversion to a cash balance plan on the grounds that it deprived him of already accrued benefits. The First Circuit squarely rejected this contention. Implicitly adopting the Defendants' definition of "accrued benefit," it held that there was no violation of the anti-cutback rule because the conversion protected the entire dollar amount of the plaintiff's pension benefit based on the plaintiff's work for the company up to the point of the amendment. *Id.* The court found that at most the amendment eliminated future expected benefit accruals—an elimination permitted under the anti-cutback rule.[9] *Id.*

A proposed Treasury Department regulation also adopts the Defendant's interpretation of the anti-cutback rule. Reorganization Plan No. 4 of 1978, § 101, 43 Fed.Reg. 47714 (1978), 92 Stat. 3790, gives the Secretary of the Treasury the ultimate authority to interpret both § 1054(g) and Internal Revenue Code's parallel anti-cutback rule, 26 U.S.C. § 411(6)(d). Proposed Treasury Regulation § 1.411(d)–3, 69 Fed.Reg. 13769, 13770 (March 24, 2004), provides that, "in determining whether a

---

**9.** Under the old benefit plan, the plaintiff's benefits would have kept accruing until his retirement on September 30, 1998, and he would have received $31,882.12 per year during retirement. *Id.* at 5. After the 1997 amendment to the plan, the plaintiff received

the entire dollar amount of his benefits under the old plan calculated up to the point of the amendment, but for the period after the amendment he received $3,084.02 less per year than he would have under the old plan. *Id.*

reduction [for the purposes of the anti-cutback rule] has occurred, all amendments with the same applicable amendment date ... are treated as one plan amendment." In other words, if two amendments have the same amendment date, and one amendment increases the participant's early retirement annuity, "and the other amendment decreases the early retirement factors that are used to determine the early retirement annuity, the amendments are treated as one amendment and only violate [the anti-cutback] rule if the net dollar amount of the early retirement annuity after the two amendments is lower at any point in time than it would have been without the two amendments." *Id.*

Defendants' interpretation of the anti-cutback rule does not mean that individual features of a pre-amendment benefit formula may never be taken into account in determining whether a plan amendment reduces a participant's accrued benefit. Quite the opposite. All features of a benefit formula—including the interest rate used to calculate an offset, a clause providing for a fractional reduction in the offset for certain participants, or the absence of an offset for Social Security income—must be considered when determining the accrued benefit under the pre-amendment plan. Thus, a spike in interest rates used to determine an offset could result in an impermissible cutback of accrued benefits, but not when another amendment either increases or preserves the amount of participants' benefits based on work up until that point.

As sensible as the Defendants' approach is, this is not the approach the Ninth Circuit has taken; rather, Defendants' approach is the position taken by Judge Paez in dissent in *Michael v. Riverside Cement Co. Pension Plan,* 266 F.3d 1023, 1029–30 (9th Cir.2001) and by the proposed Treasury Regulation discussed above, which ex-

plicitly seeks to overrule *Michael, see* 69 Fed.Reg. at 13770 n. 3. It is a position the Court would like to follow because it is correct, but cannot because the law in this Circuit as it now exists will not allow it. The Treasury Department's proposed regulation has not yet become law, and the Court may not take cognizance of it. *See Rural Legal Assistance, Inc. v. Legal Servs. Corp.,* 917 F.2d 1171, 1173 n. 5 (9th Cir.1990) ("We decline to take cognizance of a proposed regulation ... because a proposed regulation does not represent an agency's considered interpretation of its statute.") (quotation omitted). Further, as shown below, the majority's opinion in *Michael* cannot be persuasively distinguished from the facts of this case.

The plaintiff in *Michael* retired initially at age 49. *Michael,* 266 F.3d at 1024. At the time of his first retirement, Riverside's pension plan (the "Plan") provided that if an early retiree decided to return to work, his pension benefits upon subsequent retirement would not be offset or reduced by the amount of money he received during his first retirement. *Id.* Five years after his first retirement, Michael returned to work for Riverside. *Id.* When he returned, the Plan continued to provide that his pension upon subsequent retirement would not be offset by benefits received during the period of early retirement. *Id.* at 1025.

During Michael's reemployment, however, Riverside amended the Plan by merging it with its parent company's plan. *Id.* The amended Plan provided that a retiree's prior receipt of retirement benefits *would* reduce the pension benefits otherwise payable upon later retirement. *Id.* Significantly, the amended Plan also increased Michael's net benefits. *Id.* Had the unamended Plan remained in effect at Michael's second retirement, Michael would have been entitled to a net benefit

of $800.03 per month. *Id.* at 1026. Under the amended Plan, Michael received $1,035.53 per month. *Id.* Nevertheless, the majority held that the elimination of the unamended Plan's no-offset rule violated the anti-cutback rule. *Id.* The no-offset rule was phrased in mandatory, unconditional terms, and the court found that it could not be tampered with. *Id.* at 1028.

The Court has searched for but has not found a persuasive means to distinguish *Michael* from the facts of this case. The problem is that *Michael's* holding is simply at odds with the Court's and the Defendants' interpretation of the anti-cutback rule. It proceeds from a fundamentally flawed premise: that a court may "look[ ] beyond the net effect of a plan amendment on annual benefit payments, *to the features of the benefit formula itself,* and [find] an impermissible reduction of an accrued benefit." *Id.* at 1027 (emphasis added). Thus, it instructs that discrete elements of a benefit formula—like a no-offset rule—can themselves be accrued benefits protected from elimination by amendment, even if other amendments actually increase the participants' pensions "from their dollar level prior to the amendment" or preserve them at the same dollar level. *Id.* Once this premise is accepted, a slippery slope leads right to the facts presented here. There is simply no way to distinguish *Michael* in a manner that is consistent with the statute, its legislative history, and other binding precedent.

The slippery slope created by the decision in *Michael* stems from the fact that the Ninth Circuit in that case focused on the mandatory nature of the no-offset rule

for early retirees in the unamended Plan as the basis for its finding that the rule constituted an accrued benefit. *Id.* at 1027. The unamended Plan provided that "[t]he pension payable upon such subsequent retirement *shall* be calculated as if the Pensioner were then first retired . . . ." *Id.* at 1025 n. 1 (emphasis added). The court interpreted this mandatory language as a promise that an early retiree's benefits upon a second retirement would always be calculated without reference to an offset, even if a participant's net benefits were increased by amendments that compensated for an amendment introducing an offset. *Id.* at 1027. But this "even if" does not appear in the Plan—the court implied it from the word "shall." In other words, the court found that the word "shall" created an unconditional promise and construed this promise to be the accrued benefit protected by the anti-cutback rule, rather than the dollar amount of the benefit as it existed up to the point of the amendment.

Like all retirement plans, the Garrett Retirement Plan contains similar mandatory language and unconditional "promises." The Plan provides the Secured Benefit Accounts of participants who retire early or separate from service before age 65 "shall be" increased by "Credited Interest," and it defines "Credited Interest" in turn as "interest computed annually at 3–1/2%." [10] (Garrett Retirement Plan §§ 1.3, 4.1(c).) Further, the Plan provides that all retirees who have completed more than 35 years of service "shall" receive a fractional reduction in the amount of their Secured Benefit Offset. (*Id.*) The Plan also provides that the Objective Retirement In-

---

**10.** Defendants point out that the Garrett Retirement Plan's definition of "Credited Interest" also states that the interest rate may be "such other rates as may be determined by the Committee from time to time." (*Id.*) The response under *Michael* is simple: when the

Garrett Retirement Plan was merged with and into the Signal Retirement Plan, no other interest rate was stated in the Garrett Retirement Plan; any retroactive change in the rate would be contrary to what was "promised."

come for a participant, whether an early retiree or not, "shall be" calculated pursuant to a series of formulas, none of which contain a social security offset.[11] (*Id.* § 4.1(b).) The absence of a Social Security offset in the Garrett Retirement Plan is functionally no different than the no-offset rule in *Michael*. Under *Michael's* logic, each of these so-called unconditional promises—in reality separate components of one overall benefit formula—are accrued early retirement benefits forever protected from downward adjustment or elimination.

In their effort to distinguish *Michael*, Defendants point out that *Michael* involved an early retirement benefit and suggest that the scope of protection for such benefits under § 1054(g)(2) of the anti-cutback rule is broader than for other benefits. This distinction is without a difference. First, the court in *Michael* does not state or intimate that the tests under § 1054(g)(1) and (g)(2) are different. Rather, it simply calls the amendment to the Plan a violation of "the anti-cutback provision of 29 U.S.C. § 1054(g)." *Michael*, 266 F.3d at 1026. If the court had announced a different test for violations of § 1054(g)(2) than for violations of § 1054(g)(1), then one would expect it to at least say as much. Even Judge Paez in dissent frames the question as whether the addition of the offset violates § 1054(g), referring to Michael's claim as a " § [1054](g) claim" and stating that he "cannot agree with the majority's application of § [1054](g)." *Michael*, 266 F.3d at 1026–29.

Second, Defendants' suggestion that § 1054(g)(2) offers broader protection than § 1054(g)(1) is contrary to the terms of the statute and its legislative history. Con-

gress enacted § 1054(g)(2) for the purposes of clarifying that early retirement benefits and retirement-type subsidies are entitled to the *same* protection from reduction by amendment as other benefits, not more. Before the amendment, some courts did not protect early retirement benefits or retirement-type subsidies because they were not considered to be "accrued benefits" within the meaning of 29 U.S.C. § 1002(23)(A). Section § 1002(23)(A) defines an accrued benefit in the case of a defined benefit plan as "an annual benefit commencing at normal retirement age." Because an early retirement benefit provides a benefit commencing before normal retirement age, some courts found that early retirement benefits did not fit within this definition and thus were not protected under the anti-cutback rule. *See, e.g., Bencivenga v. Western Pa. Teamsters and Employers Pension Fund*, 763 F.2d 574, 577 (3d Cir.1985).

To make clear that the anti-cutback rule protects early retirement benefits to the same extent as other benefits, Congress modified § 1054(g) to provide that early retirement benefits and retirement-type subsidies are to be considered accrued for the purposes of the anti-cutback rule. *Bellas v. CBS, Inc.*, 221 F.3d 517, 523 (3d Cir.2000); *see also Central Laborers' Pension Fund*, 124 S.Ct. at 2235 ("After some initial question about whether the provision addressed early retirement benefits, a 1984 amendment made it clear that it does."); S.Rep. No. 98–575, at 29, 1984 U.S.C.C.A.N. 2547, 2575 ("The bill clarifies the scope of the protection against such decreases.") This is why the § 1054(g)(2) begins with the phrase, "[f]or the purposes of paragraph (1)" and continues with "an

---

**11.** Indeed, a 1976 First Revision of the Garrett Retirement Plan Summary Plan Description states: "Q: Will my total benefits from *the Garrett Retirement Plan be reduced if I am eligible to receive Social Security Bene-* fits? A: No. Your retirement benefits are in addition to your Social Security Benefits." (*See* Exh. M. to Promislo Decl. at HW0000481.)

amendment ... eliminating or reducing an early retirement benefit or a retirement-type subsidy ... with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits." 29 U.S.C. § 1054(g)(2). Contrary to the Defendants' suggestion, § 1054(g)(2) does not single out early retirement benefits for special treatment; rather, it provides that they shall be protected to the same extent as other benefits.

Third, *Michael* relies on *Shaw v. Int'l Ass'n of Machinists & Aerospace Workers Pension Plan,* 750 F.2d 1458, 1460 (9th Cir.1985), a case brought under § 1054(g)(1), to support its decision to look beyond the net effect of an amendment on annual pension payments and instead to the individual components of the benefit formula itself. The plan at issue in *Shaw* set forth the following formula for calculating a participant's monthly retirement benefit: 2.5% × years of credited service × final monthly salary. *Id.* at 1460. It also included a "living pension" feature that provided for adjustment of the benefit after retirement by substituting in the formula the current monthly salary of the retiree's old job in the place of the retiree's final monthly salary. *Id.* The defendants later amended the plan to phase out this feature. *Id.* Under the amended plan, retirees were entitled to a 100% adjustment from 1979–1980, a 75% adjustment from 1981–1982, and 25% adjustment from 1983–1984, and no adjustment thereafter. *Id.*

After the amendment to the plan in *Shaw,* no retiree suffered a decrease in the actual dollar amount of his annuity. A retiree receiving a pension of $500.00 per month before the amendment actually received at least the same monthly amount going forward and likely more under the amended plan (if the current monthly salary of his old job had increased from 1979–1984). But the retiree's pension would not have increased at the same rate as before—he would only be entitled to an upward adjustment for a few years; thereafter, he would get no more increases in his periodic payment. The Ninth Circuit held that the elimination of the living pension feature reduced an accrued benefit in violation of the anti-cutback rule. *Id.* at 1464. Like the court in *Michael,* the court in *Shaw* found the individual piece of the benefit formula itself to be the accrued benefit, rather than the dollar amount of the participant's annual benefit payments up to the point of the amendment. *Id.*

The facts of *Shaw* and *Michael* are fundamentally no different from the facts of *Campbell.* All three cases involve the elimination or reduction of expected future increases in the dollar amount of participants' pension payments. In *Shaw,* the plaintiff expected his pension payments to rise year after year at the same rate as a worker in his current job.[12] In *Michael,* the plaintiff expected his net annual benefits to rise during the period of his reemployment at the same rate as other Riverside employees with the same years of credited service. And in *Campbell, id.* at 8, older workers expected their net annual benefits to increase at a rapid rate during their final years of employment (because the benefit formula took final average salary into account)—an expectation that was defeated by the company's conversion to a cash balance plan.

Yet, in *Campbell, id.* at 8–9, the First Circuit held that the conversion—which eliminated the benefit formulas in the previous plan—reduced only expected future

---

**12.** Nothing in the plan actually required an increase in the amount of the plaintiff's monthly benefits—if the current salary of the plaintiff's old job remained stable, there would be no increase. The plaintiff merely *expected* an increase.

accruals; no violation of the anti-cutback rule occurred because the conversion preserved the dollar amount of participants' benefits up to the point of the amendment. *Id.* at 8–9. Pushed to their logical conclusion, *Michael* and *Shaw* would invalidate conversions to cash balance plans. Their spin on the anti-cutback rule in effect transforms the rule from one that preserves the amount of a participant's periodic payment from decrease to one that requires an increase. But the anti-cutback rule, properly interpreted, contains no such requirement.

In the administrative proceedings below, the plan administrator suggested that *Shaw* and *Michael* are distinguishable from this case because the defendants in those cases changed the terms of the plan *after* the plaintiffs had already either retired or retired early and commenced receiving benefits. This distinction, however, does not work. Nothing in the text or legislative history of the anti-cutback rule suggests that an accrued benefit is protected only if a participant actually retires and receives benefits; nor is there any suggestion that a benefit becomes accrued for the purposes of the rule only upon retirement. Indeed, if the anti-cutback rule protected only retirees to the exclusion of all other plan participants, it would lose much of its force and effect—many if not most plan participants are current employees, not retirees.

Further, in both *Shaw* and *Michael,* the Ninth Circuit focused not on the fact that the plaintiffs had already retired, but rather on the plaintiffs' purported "justified expectation[s]." *Michael,* 266 F.3d at 1027. These expectations arose not from the fact of retirement, but rather from the mandatory and unconditional terms in the unamended plans. *See id.* Under *Michael's* reasoning, the Plaintiffs here had equally "justified expectations." The Garrett Retirement Plan provided that a participant's Secured Benefit Account *shall* be projected using a 3.5% interest rate; that a participant with more than 35 years of credited service *shall* receive a fractional reduction in his Secured Benefit Account offset; and that participant's benefit *shall* be calculated using a series of formulas, none of which included a Social Security offset.

Defendants' last argument—that there can be no violation of the anti-cutback rule as a matter of law because the Signal Retirement Plan explicitly protects a participant's accrued benefit—is also unpersuasive in light of *Shaw* and *Michael.* The Plan provision cited by the Defendants protects only the product of the unamended benefit formula—i.e., the participant's net annuity under the unamended formula up to the point of the amendment. It states: "[T]he 'Accrued Benefit' as of December 31, 1983 of any Employee or Former Employee who was a participant in any plan which merged with this Plan effective January 1, 1984 shall not be less than his 'Accrued Benefit' as of December 1, 1983 determined under the terms of such other plan."[13] (Signal Retirement Plan § 4.10(c).) The plan in *Michael,* 266 F.3d at 1025 n. 2, contained a similar "anti-cutback" provision. This provision had no impact on the Ninth Circuit's analysis, because the court construed the formula rather than the product of the formula to

13. The phrases "less than" and "as of" clearly contemplate and protect a dollar amount. If, however, § 4.10(c), protects a participant's "accrued benefit" as the Ninth Circuit has defined it (without reference to a dollar amount), then this section still does not obviate Plaintiff's anti-cutback challenge. A plan administrator may not use his discretion to interpret a plan (in this case, the meaning of "accrued benefit") in a way that denies a participant accrued benefits protected by the anti-cutback rule. 26 C.F.R. § 1.411(d)–4, Q & A 4.

be the protected accrued benefit. *Id.* at 1027.

The fact of the matter is that *Michael* and *Shaw* cannot be persuasively distinguished from the facts of this case—those cases simply interpret the scope of the anti-cutback rule much more broadly than either this Court or the Defendants. The Court agrees with the interpretation of the anti-cutback rule proffered by Judge Paez in dissent in *Michael*, 266 F.3d at 1029: The rule does not protect discrete elements of a benefit formula from elimination or reduction by amendment; rather, the product of the pre-amendment benefit formula is the protected accrued benefit for the purposes of the rule. Thus, "if for a particular participant, the upside of the post-amendment benefit formula outweighs or equals the downside (as compared to the pre-amendment formula), then such an amendment would not constitute a decrease in the participant's accrued benefit." *Id.* Judge Paez's interpretation, however, is not the law in this Circuit. Thus, the Court grants Plaintiffs' request for summary judgment on their § 1054(g) claims and denies Defendants' request to dismiss these claims.

This Court would overrule *Shaw* and *Michael* if it had the power, and urges the Ninth Circuit to do so if the Treasury Department's proposed regulation does not become law before this case is appealed. Plaintiffs will undoubtedly argue that the Supreme Court's decision in *Heinz*, 124 S.Ct. at 2236, forecloses any court-ordered change in the law because it too adopts their interpretation of the anti-cutback rule. *Heinz*, however, is not as broad as Plaintiffs suggest. Thomas Heinz, the lead plaintiff in *Heinz*, worked in the construction industry in Illinois. *Id.* By 1996, he had accrued enough pension credits to qualify for early retirement payments under his defined benefit plan. *Id.* Under the terms of the plan, post-retire-

ment employment in certain industries or jobs disqualified retirees from receiving their monthly payment. *Id.* If the retiree worked in a job listed in the "disqualifying employment" section of the plan, his monthly payments would be suspended until he stopped the disqualifying work. *Id.*

When Heinz retired in 1996, "disqualifying employment" included union and non-union construction jobs, but did not cover employment in a supervisory capacity. *Id.* After retiring, Heinz obtained jobs as a supervisor in the construction industry and continued receiving his monthly benefit. *Id.* In 1998, the plan's definition of "disqualifying employment" was amended to include any job "in any capacity in the construction industry (either as a union or non-union construction worker)." *Id.* Plan administrators informed Heinz that the amended definition covered supervisory work and that his monthly payments would be suspended unless he left his job. *Id.* Heinz kept working, and the plan stopped paying his benefits. *Id.* Heinz sued to recover benefits on the ground that applying the amended definition of "disqualifying employment" violated the anti-cutback rule. The district court ruled against Heinz, but the Seventh Circuit reversed.

In affirming the Seventh Circuit, the Supreme Court rejected the Plan's attempt to limit the scope of the anti-cutback rule to amendments affecting only the method for calculating the amount of the periodic payment. *Id.*, 124 S.Ct. at 2236. That is, the Plan argued that the amendment at issue only suspended payment of the monthly benefit but did not reduce the actual amount of the monthly payment, and, therefore, did not result in an impermissible cutback. *Heinz*, 124 S.Ct. at 2236. The Supreme Court rejected this argument, noting that under this constricted reading of the anti-cutback rule, even

an amendment permanently suspending benefits would be permissible. *Id.* It held that new conditions imposed on receipt of a benefit already accrued must also be taken into account in determining whether a benefit has been reduced: "[A]n amendment placing materially greater restrictions on the receipt of the benefit 'reduces' the benefit just as surely as a decrease in the size of the monthly payment." *Id.* (quotation omitted).

Plaintiffs take the Supreme Court's disagreement with the Plan's argument that the anti-cutback rule "applies only to amendments directly altering the nominal dollar amount of a retiree's monthly pension payment," *id.,* 124 S.Ct. at 2236, to mean that a court may never look to the nominal dollar amount of the plaintiffs' monthly benefit when determining whether an amendment violates the anti-cutback rule. But the Court in *Heinz* merely held that it does not matter whether the formula for calculating the monthly benefits remains the same if benefits themselves are suspended or if new conditions are imposed that make it much harder to receive those benefits. The issue in this case is not about new conditions imposed on *receipt* of monthly pension benefits, but rather about whether the anti-cutback rule prevents downward adjustments to portions of a pension benefit formula even if participants' monthly pension benefits remain the same or actually increase. In the Court's view, *Heinz* is inapplicable to this case and would not prevent the Ninth Circuit from changing its interpretation of the anti-cutback rule.

### G. Plaintiffs' Nonforfeitability Claim

■ In addition to alleging that the modifications to the Garrett Retirement Plan violate ERISA's anti-cutback rule, Plaintiffs also claim that the amendments violate the nonforfeitability provisions of 29 U.S.C. § 1053, which set forth rules and schedules governing vesting of benefits.

Plaintiffs' claim is premised on a fundamental misunderstanding of the difference between accrued benefits and vested benefits, and fails as a matter of law.

■ "The concepts of accrued [benefits] on the one hand, and vested or 'nonforfeitable' [benefits], on the other, are related, but not the same." *Hoover v. Cumberland, M.D. Area Teamsters Pension Fund,* 756 F.2d 977, 983 (3d Cir.1985); *see also Stewart v. Nat'l Shopmen Pension Fund,* 730 F.2d 1552, 1561 (D.C.Cir.1984). Participants in a pension plan become fully vested when they gain a nonforfeitable right to receive their entire accrued benefit. *Hoover,* 756 F.2d at 983. The vesting schedules set forth in § 1053 specify "the *time* at which an employee obtains a nonforfeitable right to a particular percentage of his accrued benefits." *Stewart,* 730 F.2d at 1561 (emphasis added). They do not provide any formula or schedule for determining the *amount* of the accrued benefit. *Id.* "Thus, 'vesting' governs when an employee has a *right* to a pension; 'accrued benefit' is used in calculating the *amount* to which the employee is entitled." *Id.*

The amendments to the Garrett Retirement Plan that Plaintiffs challenge do not change *when* the Plaintiffs are entitled to receive their benefits; rather, they modify the amount of those benefits. Section 1053 guarantees that a participant has a claim for protected benefits at a certain time, " 'but it does not guarantee a particular amount or a method for calculating the benefit.' " *Alessi v. Raybestos–Manhattan, Inc.,* 451 U.S. 504, 512, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981) (quoting *Nachman Corp. v. Pension Benefit Guaranty Corp.,* 446 U.S. 359, 372–73, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980)). Accordingly, the Court grants the Defendants' request to dismiss Plaintiffs' § 1053 claim and denies

Plaintiffs' request for partial summary judgment.

## H. The Anti–Backloading Claim

■ Comparing the amended benefit formulas set forth in the Signal Retirement Plan with the formulas set forth in the Garrett Retirement Plan, Plaintiffs argue that the amended formulas violate ERISA's minimum standards for accrual of benefits, also known as the anti-backloading provisions, set forth in 29 U.S.C. § 1054. This claim fails as a matter of law on the face of the Complaint and the undisputed documents referenced in the Complaint.

A plan "backloads" benefits when it "provide[s] inordinately low rates of accrual in the employee's early years of service when he is most likely to leave the firm and concentrat[es] the accrual of benefits in the employee's later years of service when he is most likely to remain with the firm until retirement." H.R.Rep. No. 93807 (1974), *reprinted in* 1974 U.S.C.C.A.N. 4639, 4688. The anti-backloading rules require defined benefit plans to adopt one of three accrual schedules, referred to as the "three percent schedule," the "133⅓ percent schedule," and the "fractional schedule." *See* 29 U.S.C. § 1054(b)(1)(A)-(C).

The Plans at issue here follow the 133⅓ percent schedule. Under this schedule, the value of the benefit an employee accrues in any one year cannot be more than 33⅓ percent greater than the value of the benefit an employee accrued in any prior year of employment. *See* 29 U.S.C. § 1054(b)(1)(B). This requirement prevents a plan from weighing the accrual of benefits heavily in favor of long-term employees at the expense of short-term employees.

■ Because the 133⅓ percent schedule would also prevent a plan from ever increasing benefits for all employees by more than one-third of the value of the original benefits, the schedule provides that "any amendment to the plan which is in effect for the current year shall be treated as in effect for all other plan years" and that "any change in an accrual rate which does not apply to any individual who is or could be a participant in the current year shall be disregarded." *Id.* Thus, in determining whether a new benefit formula violates the 133⅓ percent rule, one does not compare the new formula with the old formula; rather, the backloading question must be answered by considering the new formula on a stand-alone basis. *See Langman v. Laub*, 328 F.3d 68, 71 (2d Cir.2003) (holding that 133⅓ percent test is "irrelevant to across-the-board increases in benefit rates made at some future time on behalf of all current employees regardless of period of service").

Because Plaintiffs' anti-backloading claim attempts to compare the unamended benefit formulas with the amended benefit formulas, Plaintiffs fail to state a claim for relief. The Court therefore grants the Defendants' request to dismiss this claim.

## I. Plaintiffs' Claim Pursuant to 29 U.S.C. § 1054(b)(1)(G)

Plaintiffs have agreed to withdraw their § 1054(b)(1)(G) claim. (*See* Pls.' Opp. to Defs.' Mot. to Dismiss and Pls.' Cross Mot. for Partial Summ. J. at 37 n. 23.) The claim will therefore be dismissed without prejudice. *See* Fed.R.Civ.P. 41(a)(1)(i).

## J. Plaintiffs' Claims for Violation of the Terms of the Plan

In addition to raising the statutory violations discussed above, Plaintiffs challenge various aspects of the plan administrator's interpretation of the terms Signal Retirement Plan. Plaintiffs claim that the plan administrator incorrectly applied a Secured Benefit Account offset to the mini-

mum benefit formulas set forth in § 4.2(c) of the Signal Retirement Plan; improperly determined that the 1% Minimum Benefits Formula applies to former employees of the Garrett Corporation; and misapplied § 4.10(c) of the Signal Retirement Plan by failing to apply the Garrett Retirement Plan's "interest rates and assumptions."

### 1. Standard of Review

At the outset, the parties dispute the applicable standard of review. Although ERISA does not set forth the standard of review for claims challenging plan interpretation, the United States Supreme Court has held that "a denial of benefits challenged under [29 U.S.C.] § 1132(a)(1)(B) [shall be] reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). If the plan gives the administrator discretionary authority, an arbitrary and capricious standard of review applies to the decision of the administrator or fiduciary. *Id.*

#### a. *De Novo* Review Applies

■ A *de novo* standard of review applies to Plaintiffs' non-statutory claims. While the Honeywell Retirement Earnings Plan—the version of the Plan in effect when the plan administrator considered Plaintiffs' claims—confers discretionary authority on the plan administrator, Plaintiffs seek benefits under the terms of prior merged plans, which the Defendants admit did not confer such discretion. Because there is no dispute that Plaintiffs' benefits vested under these prior plans, *de novo* review is required.

ERISA regulates two types of benefit plans: pension benefit plans and welfare benefit plans. Pension benefit plans are subject to statutory vesting and accrual requirements. *See* 29 U.S.C. § 1053(a). Welfare benefit plans, however, are expressly exempt from the statutory vesting and accrual requirements that ERISA imposes on pension benefit plans. *See* 29 U.S.C. § 1051(1). Accordingly, absent any provision to the contrary in the plan itself, an employer may amend the terms of a welfare benefit plan or terminate it entirely. *Grosz–Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1160 n. 24 (9th Cir.2001).

In *Grosz–Salomon*, 237 F.3d at 1160–61, the Ninth Circuit noted a distinction between amending a plan to provide a plan administrator with discretion to determine eligibility for benefits in a plan where rights had *vested* and doing so in a plan where rights had not vested (such as the typical welfare benefit plan). The Court held that if the plaintiff's benefits have not vested and if the defendants follow the procedure for amending the plan, then the addition of a discretionary authority provision in the plan applies to all decisions made as of the effective date of the amendment. *Id.*

The Defendants do not contest that Plaintiffs' benefits vested under prior iterations of the Plan. Nor do they dispute that these prior versions did not confer discretionary authority on the plan administrator. Rather, they argue for an ill-supported reading of *Grosz–Salomon*. As Defendants characterize it, *Grosz–Salomon* "decided whether a plan amendment, *adopted after the plaintiff had filed her administrative claim*, could grant the plan administrator discretion to decide [her] claim." (Defs.' Reply at 18.) Focusing exclusively on the timing of the plan administrator's decision, Defendants assert that the "Ninth Circuit held that the claim should be controlled by the plan in effect at the time the administrator decided the claim, *not* the pre-amendment plan." (*Id.*)

Defendants are correct that the Ninth Circuit in *Grosz–Salomon* held that the plan in effect at the time the administrator decided the plaintiff's administrative claims governed. But contrary to the Defendants' suggestion, that decision did not rest solely on timing. Rather, it turned on the fact that the plaintiff, who was seeking benefits under a welfare benefit plan, had no vested rights under that plan or any of its prior versions. *Grosz–Salomon*, 237 F.3d at 1160–61. This case concerns pension benefit plans under which Plaintiffs' benefits had vested and pursuant to which the plan administrator had no discretionary authority. Thus, *de novo* review applies.

## 2. Application of a Secured Benefit Account Offset to Minimum Benefits

■ The plan administrator incorrectly determined that a Secured Benefit Account offset applies to the Signal Retirement Plan's minimum benefit formulas— the unambiguous language of § 4.2(e)(i)(b) permits no Secured Benefit Account offset to these formulas.

■ Federal common law principles of contract interpretation guide the interpretation of an ERISA retirement plan. *Richardson v. Pension Plan of Bethlehem Steel Corp.*, 112 F.3d 982, 985 (9th Cir. 1997). The terms of the plan should be interpreted "in an ordinary and popular sense as would a [person] of average intelligence and experience." *Id.* When a dispute arises, a court should "first look to the explicit language of the agreement to determine, if possible, the clear intent of the parties." *Id.* An ambiguity exists only when the terms of the plan are "subject to more than one reasonable interpretation." *McDaniel*, 203 F.3d at 1110. When a plan is ambiguous, a court will examine extrinsic evidence to determine the intent of the parties. *Richardson*, 112 F.3d at 985.

■ The unambiguous terms of the Signal Retirement Plan do not permit a Secured Benefit Account offset to the minimum benefit formulas contained in § 4.2(c) of the Plan. Signal Retirement Plan § 4.2(e)(i)(b) provides for a Secured Benefit Account offset, but this provision by its terms applies only to the "Normal Retirement Benefit provided [under § 4.2(b) ]." It is a fundamental principle of contract interpretation that the expression of one thing is the exclusion of another ("*expressio unius est exlusio alterius*"). *See TRW, Inc. v. Andrews*, 534 U.S. 19, 28, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001). Applying this maxim to the Signal Plan, there is no way to construe § 4.2(e)(i) as also applying to the minimum benefit formulas in § 4.2(c).

Defendants argue that the plan administrator correctly applied an offset to the minimum benefit formulas because the summary plan description ("SPD") distributed to all participants disclosed such an offset. This argument is unavailing. The Ninth Circuit has specifically held that "when the plan master document is more favorable to the employee" than the SPD, the unambiguous provisions of the master document control despite contrary unambiguous provisions in the SPD. *Bergt v. Ret. Plan for Pilots Employed by MarkAir, Inc.*, 293 F.3d 1139, 1145 (9th Cir. 2002). Although the Defendants suggest that § 4.2(e)(i)(b) is ambiguous, they have not identified any alleged ambiguity. Defendants may not rely on the SPD to contradict the clear terms of the Plan.

Defendants further argue that failure to apply a Secured Benefit Account offset to the Plan's minimum benefit formulas would subvert the intended floor-offset structure of the Signal Retirement Plan. This argument is equally unavailing. While it is true that a court should not read individual sections of an agreement

out of context to achieve a result not originally intended by the parties, *Klamath Water Users Protective Ass'n v. Patterson,* 204 F.3d 1206, 1210 (9th Cir.1999), there is nothing in the text of the Signal Retirement Plan that suggests that all benefit formulas set forth therein must have a Secured Benefit Account offset. Indeed, under § 4.2(e)(i)(b), a Secured Benefit Account offset unambiguously does *not* apply to the minimum benefit formulas set forth in § 4.2(c). Defendants' unsupported assertions regarding the intent of the Plan cannot overcome the clear language of the plan. *McGee v. Equicor–Equitable HCA, Corp.,* 953 F.2d 1192, 1202 (10th Cir.1992) (holding that words cannot be written into an ERISA plan imparting an intent wholly unexpressed when it was executed).

Next, Defendants contend that Plaintiffs' interpretation of § 4.2(e)(i)(b) would turn the purpose of the minimum benefit on its head by transforming it into the primary pension benefit under the Plan. Defendants, however, have produced no evidence to show that failure to apply a Secured Benefit Account offset to § 4.2(c) would have this effect. Although the minimum benefit formulas do not contain a Secured Benefit Account offset, they have smaller multipliers than the basic benefit formulas and no Social Security offset. Thus, the Court cannot conclude on the face of the Plan that failure to apply an offset to the minimum benefit formulas would increase the minimum benefit to the extent that it would become the primary pension benefit. In responding to Plaintiffs' request for partial summary judgment on this ground, Defendants must do more than simply show there is some metaphysical doubt as to the material facts— they must set forth specific facts showing that there is a genuine issue for trial. *See Brinson,* 53 F.3d at 1048–50.

Defendants next argue that accepting Plaintiffs' interpretation of § 4.2(e)(i)(b)

would render meaningless the provision in the Signal Retirement Plan that permits participants to transfer their Secured Benefit Account balances into the Retirement Plan. This is simply another variation of Defendants' argument that the alleged goals of the Retirement Plan require an offset to the minimum benefit formulas. According to Defendants, the benefit payable under the Retirement Plan must be offset by the value of a participant's Secured Benefit Account whenever the participant elects not to transfer the balance of his Account into the Retirement Plan. The Plan, however, states otherwise. In the case of a participant who elects not to transfer his Secured Benefit Account balance to the Retirement Plan, § 4.2(e)(i) provides for a Secured Benefit Account offset only to the Normal Retirement Benefit set forth in § 4.2(b). The text of the Plan controls here, not the unexpressed intent of the drafters. *See Blau v. Del Monte,* 748 F.2d 1348, 1355 (9th Cir.1984) (holding that court will not defer to unexpressed intent or purposes behind an ERISA plan).

██ Finally, Defendants argue that the plan administrator has for the past twenty years consistently applied a Secured Benefit Account offset to the minimum benefit formulas set forth in § 4.2(c). A plan administrator, however, "lacks discretion to rewrite [a] Plan." *Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term Disability Income Plan,* 85 F.3d 455, 460 (9th Cir.1996); *see also Gallo v. Madera,* 136 F.3d 326, 330–31 (2d Cir. 1998) ("[T]he fact that the trustees have applied this reading with respect to another beneficiary is of no moment. Consistency cannot excuse impermissibility."). The consistency of the plan administrator's interpretation is irrelevant.

Even if the language of § 4.2(e)(i)(b) was not clear, the remaining subsections of

§ 4.2 buttress the conclusion that the Secured Benefit Account offset applies only to the basic benefit formulas in § 4.2(b). Like the offset described in § 4.2(e)(i)(b), the offset described in § 4.2(f)—which appears to be a catchall provision for other offsets or adjustments contained in plans that merged on January 1, 1984—is specifically limited to "the Normal Retirement Benefit provided under subparagraph (b) of this Section 4.2." But unlike the offsets in § 4.2(e)(i)(b) and § 4.2(f), the offsets and enhancements described in § 4.2(e)(ii) and § 4.2(e)(iii) apply to the participant's "Normal Retirement Benefit." These sections make no distinction between subparagraph (b) and other subparagraphs of § 4.2. Thus, where the Signal Retirement Plan provides for offsets only to the basic benefit, it says so; where the Plan limits more than the basic benefit, it spells the limitation out as well.

The unambiguous terms of the Signal Retirement Plan do not permit a Secured Benefit Account offset to the minimum benefit formulas contained in § 4.2(c). The Court will therefore grant Plaintiffs' request for partial summary judgment on this ground and deny Defendants' Motion to Dismiss.

### 3. The 1% and 1.25% Minimum Benefit Formulas

 The Plan administrator correctly determined that the Signal Retirement Plan's 1% Minimum Benefit Formula applies to employees who terminated from AlliedSignal's and Honeywell's Garrett Division.

Signal Retirement Plan § 4.2(c) sets forth two alternative minimum benefit formulas. The first formula appears in § 4.2(c)(i) and provides a minimum benefit equal to the greater of $20.00 times Credited Service or 1% of Average Final Compensation times Credited Service. This formula by its terms applies to partici-

pants who separate from service at the time they were employed by either the Garrett Corporation or one of four other named companies. The second formula appears in § 4.2(c)(ii) and provides a minimum benefit equal to 1.25% of a less inclusive definition of Average Final Compensation multiplied by Credited Service. It applies to participants who did not separate from any of the five companies listed in § 4.2(c)(i).

Garrett Corporation was a wholly owned subsidiary of Allied–Signal, Inc. ("Allied-Signal"). (DSOF ¶ 1.) It merged into AlliedSignal on September 30, 1987. (*Id.*) Garrett, however, continued to be operated as a division of AlliedSignal after this date and its employees were designated on AlliedSignal's personnel records as Garrett Division employees. (Exh. O. to Promislo Decl. at HW0000533.) The only change for Garrett employees after the merger was that they now worked for the Garrett Division rather than the Garrett Corporation. (*Id.*)

Plaintiffs contend that participants who terminated employment from the post-merger Garrett Division of AlliedSignal are entitled to have their pension benefits calculated using the 1.25% Minimum Benefit Formula because as of that date the Garrett Corporation no longer existed and Garrett participants were not employed by any of the other companies listed in § 4.2(c)(i). Thus, under Plaintiffs' theory, a mere corporate formality—the name change resulting from the merger of the Garrett Corporation into its parent company AlliedSignal—instantly changed the formula used to calculate Plaintiffs' pension benefits, even though nothing else changed for Plaintiffs because the former Garrett Corporation maintained its separate existence, albeit now as an operating entity or division.

■ Plaintiffs' interpretation of the Signal Retirement Plan is unreasonable. The overriding purpose of contractual interpretation is to give effect to the parties' mutual intent at the time the contract was made. *See Flores v. Am. Seafoods Co.,* 335 F.3d 904, 910 (9th Cir.2003). Consistent with this undertaking, " 'a contract should be interpreted to give meaning to all of its terms, presuming that every provision was intended to accomplish some purpose, and that none are deemed superfluous.' " *Harris v. The Epoch Group, L.C.,* 357 F.3d 822, 825 (8th Cir.2004) (quoting *Transitional Learning Cmty. at Galveston, Inc. v. United States Office of Pers. Mgmt.,* 220 F.3d 427, 431 (5th Cir. 2000)).

Construing the Plan as a whole, Plaintiffs' interpretation of § 4.2(c) is untenable. It would render the Retirement Plan's reference to "Garrett Corporation" meaningless—a result contrary to the rule of contract interpretation that disfavors constructions that nullify a contract term or render a term superfluous or redundant. Further, the Retirement Plan itself defines "Company," and by inference "Corporation," as any "successor corporation" and *"divisions* or classification." (Signal Retirement Plan § 1.13 (emphasis added).) This is consistent with the principle that a successor corporation generally acquires all the rights and obligations of its predecessor. *See State of Tenn. v. Whitworth,* 117 U.S. 139, 147, 6 S.Ct. 649, 29 L.Ed. 833 (1886). The merger of the Garrett Corporation into AlliedSignal did not change the formula used to calculate a Garrett participant's benefits.

The Court will grant summary judgment in favor of Defendants on this aspect of Plaintiffs' challenge to the Plan administrator's interpretation of the Plan. Rule 12(b)(6) permits the Court to convert a motion to dismiss to a motion for summary judgment where, as here, the moving party relies on matters outside the pleadings (in this case, the facts surrounding the Garrett Corporation's merger into Allied Signal). No notice is required—Plaintiffs have had "a full and fair opportunity to ventilate the issues involved in the motion." *Cunningham v. Rothery (In re Rothery),* 143 F.3d 546, 549 (9th Cir.1998). Delaying a ruling until Defendants file a formal motion for summary judgment would serve no purpose.

**4. The Alleged Failure to Apply the Garrett Retirement Plan's Interest Rates and Assumptions to Garrett Participants Eligible to Commence Benefits as of December 31, 1983**

■ In paragraphs 54 through 55 of the Complaint, Plaintiffs allege that the plan administrator violated the written terms of the Signal Retirement Plan by failing to apply the Garrett Retirement Plan's interest rates and assumptions to Garrett participants eligible to commence benefits as of December 31, 1983.[14] The Court denies Plaintiffs' request for summary judgment on this claim and grants the Defendants' request to dismiss.

Section 4.10(c) of the Signal Retirement Plan provides: "[T]he 'Accrued Benefit' as of December 31, 1983 of any Employee or Former Employee who was a participant in any plan which merged with this Plan effective January 1, 1984 shall not be less than his 'Accrued Benefit' as of December 31, 1983 determined under the terms of such other plan . . . ." (Signal Retirement Plan § 4.10(c)(ii).) It further provides that for participants actually eligible to commence benefits on December 31, 1983,

---

**14.** Participants who were at least 55 years of age and had at least 10 years of Credited Service were eligible to retire as of December 31, 1983 under the terms of the Garrett Retirement Plan. (Garrett Retirement Plan § 2.3(b).)

the participant's accrued benefit shall be "determined by reference to the actuarial equivalence tables or interest assumption actually specified in such other plan on December 31, 1983." (*Id.*)

In their summary judgment papers, Plaintiffs argue that § 4.10(c)(ii)'s reference to the "actuarial equivalence tables or interest assumptions actually specified in such other plan" requires the plan administrator to use a 3.5% Credited Interest rate for the purposes of projecting forward to age 65 the Secured Benefit Accounts of any former participants in the Garrett Retirement Plan eligible to retire as of December 31, 1983. The Court is not persuaded. The portion of § 4.10(c)(ii) cited by Plaintiffs unambiguously refers to the Garrett Retirement Plan's retirement-age conversion factors, not Credited Interest. The two concepts are distinct. Credited Interest, as used in § 4.1(c) of the Garrett Retirement Plan, reflects nothing more than the amount of earnings credited to a participant's Secured Benefit Account each year. The Garrett Plan's conversion factor, set forth in a table attached as Exhibit B to the Plan, by contrast, determines how a participant's Secured Benefit Account is actuarially converted into an annuity once Credited Interest has been applied to the Account.

As the Defendants note in their Motion to Dismiss, a conversion factor represents the amount of money needed to purchase $1.00 worth of a monthly annuity at any point in time. The Garrett Retirement Plan assumes that it would take $153.31 to purchase a $1.00 per month annuity commencing at age 65, assuming that this $153.31 would be invested at 3.5% for the duration of the individual's life expectancy. It is this conversion factor—specified in an actuarial table attached as Exhibit B to the Garrett Retirement Plan—that § 4.10(c)(ii) of the Signal Retirement Plan has in mind when it refers to use of the "actuarial

equivalence *tables* or interest assumption actually specified in [the Garrett Retirement Plan]" for participants eligible to commence benefits as of December 31, 1983. Plaintiffs' attempt to read something else into § 4.10(c)(ii) does not persuade the Court.

Because the Garrett Retirement Plan and Signal Retirement Plan use the same interest conversion factor, *see* Signal Retirement Plan § 4.2(e)(i)(b), Plaintiffs cannot prevail on this aspect of their challenge to the plan administrator's interpretation of the Plan. Accordingly, Plaintiffs' Motion for Partial Summary Judgment on this ground is denied, and the Defendants' Motion to Dismiss is granted. Because there is no way for Plaintiffs to cure the defect, the dismissal is with prejudice.

Practically speaking, the dismissal of this particular claim has no impact on the Plaintiffs' claim that the Defendants' miscalculated their benefits by failing to use a 3.5% interest rate to project their Secured Benefit Accounts forward to age 65. As discussed above in Section (F), the amendment increasing the rate used to determine Credited Interest violates the anti-cutback rule as interpreted by the Ninth Circuit.

### K. Plaintiffs' § 1054(h) Claims

### 1. The Amendment Providing for an Application of a Secured Benefit Offset to the Minimum Benefit Formulas

In 1993, the Signal Retirement Plan became the AlliedSignal Retirement Plan and was amended to provide for, among other things, a Secured Benefit Account offset to the 1% and 1.25% Minimum Benefit Formulas previously set forth § 4.2(c) of the Signal Plan. Defendants violated ERISA § 204(h), 29 U.S.C. § 1054(h), by failing to give notice of the amendment.

Section 1054(h) provides that a plan "may not be amended so as to provide for a significant reduction in the rate of future benefit accrual" unless the plan administrator provides notice to each applicable individual, written in a manner calculated to be understood by the average plan participant, that provides sufficient information to allow applicable individuals to understand the effect of the plan amendment. The notice must be "provided within a reasonable time before the effective date of the plan amendment." 29 U.S.C. § 1054(h)(3).

Defendants do not dispute that the plan administrator did not give notice of the amendment providing for an offset to minimum benefits. They argue, however, that the amendment only clarified the offset language set forth in § 4.2(e)(i)(b) of the Signal Plan. As discussed above, § 4.2(e)(i)(b) unambiguously did not provide for a Secured Benefit Account offset to the Plan's minimum benefit formulas. For participants who had a Secured Benefit Account offset of any amount, the amendment significantly reduced the rate of future benefit accruals. Thus, § 1054(h) required the plan administrator to give notice of the amendment to participants. Not only have Plaintiffs stated a claim, summary judgment in favor of Plaintiffs is warranted.

Further, because the amendment was retroactive, it also violated the anti-cutback rule, 29 U.S.C. § 1054(g), for the same reasons stated in Section (F) above.[15] The Court therefore also grants summary judgment to Plaintiffs on this aspect of their anti-cutback claim.

**2. The Substitution of "Garrett Division" for "Garrett Corporation"**

■ The 1% Minimum Benefit Formula set forth in § 4.2(c)(i) of the Signal Retirement Plan was also amended in 1993 to refer to the Garrett Division rather than the Garrett Corporation. Unlike the addition of the Secured Benefit Account offset, this amendment did not reduce the rate of future benefit accruals, but rather merely clarified the existing formula. As discussed in Section (J)(3), Garrett employees were never entitled to have their benefits calculated under the 1.25% Minimum Benefit Formula. The 1% Minimum Benefit Formula always applied. Accordingly, the Court grants Defendants' Motion to Dismiss this portion of Plaintiffs' §§ 1054(h) and 1054(g) claims.

**L. Failure to Produce Plan Documents**

■ Plaintiffs allege in Count IV of the Complaint that the plan administrator failed to timely respond to requests for documents in violation of ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4). Specifically, Plaintiffs allege that the plan administrator failed to timely produce: (1) the February 4, 1984 iteration of the Signal Retirement Plan, (2) Exhibit B to the Garrett Retirement Plan, (3) "documents verifying the modifications, amendment or adoption and verifying the authority to modify, amend or adopt changes to the Signal Retirement Plan," and (4) benefit calculation worksheets. With the exception of the last item, Plaintiffs have stated valid claims for relief.

Title 29 U.S.C. § 1024(b)(4) provides that "[t]he [plan] administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description, and the latest

---

**15.** In fact, unlike the amendments discussed in section (F), this amendment is a paradigmatic example of a cutback—for those participants who would have had their benefits calculated under the Minimum Benefit Formulas, the amendment actually decreases the dollar amount of the participant's net annuity.

annual report, any terminal report, the bargaining agreement, trust agreement, or other instruments under which the plan is established or operated." The Ninth Circuit has construed § 1024(b)(4) relatively narrowly. In *Hughes Salaried Retirees Action Committee v. Administrator of the Hughes Non–Bargaining Retirement Plan,* 72 F.3d 686, 691 (9th Cir.1995), the court held that the statute and legislative history indicate that § 1024(b)(4) requires general nondisclosure, subject only to the specified limits. The broad term "other instruments" is limited to documents that are "similar in nature to the class of objects that specifically precedes it"—"legal documents that describe the terms of the plan, its financial status, and other documents that restrict or govern a plan's operation." *Shaver v. Operating Eng'rs Local 428 Pension Trust Fund,* 332 F.3d 1198, 1202 (9th Cir.2003).

The February 4, 1984 version of the Signal Retirement Plan and Exhibit B to the Garrett Retirement Plan constitute legal documents that describe the terms of "the plan" within the meaning of § 1024(b)(4). Although—as Defendants point out—Plaintiffs raised their administrative claims while the Honeywell Retirement Plan was in effect, as this Order shows Plaintiffs cannot determine their benefits without reference to prior plans like the Signal and Garrett Plans. "[T]he documents contemplated by § 104(b)(4) are those that allow 'the individual participant to know[ ] exactly where he stands with respect to the plan—what benefits he may be entitled to, what circumstances may preclude him from obtaining benefits ....' " *Hughes Salaried Retirees Action Comm.,* 72 F.3d at 691. Defendants' argu-

ment that Plaintiffs were not entitled to Garrett and Signal Plan documents because those plans were not the "latest plans" has no merit—the Signal and Garrett Plans "restrict" the Honeywell Plan's operation and thus fall under § 1024(b)(4). *See Shaver,* 332 F.3d at 1202.

For similar reasons, Plaintiffs' claim that the plan administrator did not timely produce "documents verifying the modifications, amendment or adoption and verifying the authority to modify, amend or adopt changes to the Signal Retirement Plan" also states a claim for relief. While some documents verifying a modification to the Signal Plan or the authority to modify the Plan may not fall under § 1024(b)(4) (because they do not restrict or govern the Plan's operation), Plaintiffs' description is broad enough to encompass documents governing the operation of the Signal Plan, and thus, the Honeywell Plan. Under Rule 12(b)(6), a complaint should not be dismissed unless the plaintiff can prove "no set of facts in support of his claim that would entitle him to relief." *Parks Sch. of Bus., Inc. v. Symington,* 51 F.3d at 1484. Such is not the case here.

Plaintiffs, however, have not stated a claim for relief under § 1024(b)(4) with respect to their request for benefit calculation worksheets. These worksheets do not restrict or govern the Plan's operation; the plan administration merely prepares them in the course of administering the Plan. *See Shaver,* 332 F.3d at 1202. Accordingly, Defendants' request to dismiss Plaintiffs' § 1024(b)(4) claims is granted in part and denied in part. Plaintiffs have not moved for summary judgment on these claims. The Court therefore does not reach the merits of the surviving claims.[16]

---

16. Plaintiffs have brought their § 1024(b)(4) claim pursuant to both 29 U.S.C. § 1132(a)(3) (which provides for injunctive relief) and 29 U.S.C. § 1132(c) (which gives the court discretion to impose civil penalties on a plan administrator in certain circumstances). In

their *Reply* in support of their Motion to Dismiss, Defendants argue that the court may not as a matter of law impose civil penalties under 29 U.S.C. 1132(c) on the plan administrator for a § 1024(b)(4) violation. Plaintiffs

**M. Adequacy of the Summary Plan Descriptions**

 In Count V of their Amended Complaint, Plaintiffs allege that Defendants violated ERISA § 102, 29 U.S.C. § 1022, by failing to adequately disclose certain benefit formulas or formula components in their SPDs. Because the SPDs adequately disclosed the circumstances that might give rise to a loss or reduction of benefits, the Court grants Defendants' Motion to Dismiss Count V.

**1. The Court May Properly Consider the SPDs Attached to the Dauphine Declaration**

The Court rejects Plaintiffs' argument that the Court may not consider the SPDs attached to the Dauphine Declaration. On a motion to dismiss, the Court may consider documents integral to or referenced in the complaint as long as their authenticity is not in doubt. *Parrino v. FHP, Inc.*, 146 F.3d 699 (9th Cir.1998). The SPDs are the basis of Plaintiffs' claims and their authenticity is not in question. Although Plaintiffs question whether they received them, they do not question their genuineness. Accordingly, the Court may consider the SPDs in ruling on Defendants' Motion to Dismiss.

**2. The SPDs Complied With ERISA's Disclosure Requirements**

**a. The Secured Benefit Account Offset**

**i. The SPDs Adequately Disclosed the Offset**

Plaintiffs argue that the SPDs violated § 1022 because they did not disclose the interest rate used to calculate the Secured Benefit Account offset. Section 1022, however, does not require SPDs to disclose the

have not had a chance to respond to this argument, and the Court will not consider it at this time. *See Carroll v. Nakatani*, 342 F.3d 934, 942 (9th Cir.2003) (holding that a court

specific methodology used to calculate an offset.

An SPD is a written summary of the provisions of an employee benefit plan. It must, among other things, set out "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." 29 U.S.C. § 1022(b). Labor Department regulations further explain that the SPD must not be "misleading" or "misinform" participants, and that "[a]ny descriptions of exceptions, limitations, reductions, and other restrictions of plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant." 29 C.F.R. § 2420.102–2(b). The Ninth Circuit has held that an SPD need not detail the specific mechanics by which benefits may be lost, as long as it discloses the "events" or "actions" that could trigger a loss of benefit. *Atwood v. Newmont Gold Co.*, 45 F.3d 1317, 1321–22 (9th Cir.1995).

The 1984 Signal Retirement Plan SPD clearly explained that participants would have a lesser benefit under the Retirement Plan if they did not transfer their Secured Benefit Accounts to the Plan. It includes the following description of the Secured Benefit Account offset in question-and-answer format:

Q. How much will I get when I retire?

A. How much you will receive depends upon several variables, such as: ... are you transferring your GARRETT SECURED BENEFIT ACCOUNT balance to the Retirement Plan?

\* \* \* \* \* \*

Q. What happens if I have a GARRETT SECURED BENEFIT ACCOUNT?

need not review arguments not specifically and distinctly raised in a party's opening brief).

A. You can transfer your GARRETT SECURED BENEFIT ACCOUNT (SBA) to the Retirement Plan, withdraw your SBA balance and invest it in the annuity, or withdraw your SBA balance and spend it. The NORMAL RETIREMENT benefit is calculated on the assumption that you transfer your SBA to the Retirement Plan. If you don't make this transfer, your NORMAL RETIREMENT benefit will be somewhat reduced.

(Dauphine Decl. Exh. A at HW 0000987–989 [Doc. # 60].) This description adequately discloses the Secured Benefit Account offset. *See Stahl v. Tony's Bldg. Materials,* 875 F.2d 1404, 1408 (9th Cir. 1989) (holding that an SPD need only be specific enough to enable ordinary employee to sense when there is a danger that benefits could be lost or diminished).

Plaintiffs argue that § 1022 required Defendants to give an explanation of the interest rates used to calculate the offset. This argument has no merit. "No case has ever held that a mere failure to include the specific methodology used to calculate a benefit is an ERISA violation." *McCarthy v. The Dun & Bradstreet Corp.,* No. Civ.A.3:03CV431(SRU), 2004 WL 2743569, at *5 (D.Conn. Nov. 30, 2004). Section 1022 requires an SPD to disclose only the "circumstances" under which a benefit may be reduced or lost. 29 U.S.C. § 1022. An SPD is a summary, and is not required to answer every conceivable question that a participant may have. *Stahl,* 875 F.2d at 1408. A participant who was concerned or curious about the mechanics of the Secured Benefit Account offset had an opportunity to obtain or review more detailed information. *See* 29 U.S.C. §§ 1024(b)(2), 1024(b)(4). The SPDs adequately alerted Plaintiffs to the offset.[17]

### ii. The SPDs Were Not Misleading

In addition to claiming that the SPDs omitted required information, Plaintiffs argue that the information contained in the SPDs was misleading. Having reviewed the SPDs, the Court finds that the SPDs were "sufficiently accurate and comprehensive" to inform participants of their rights and obligations under the Plan. *See* 29 U.S.C. § 1022(a).

Plaintiffs argue that the 1984 Signal Retirement Plan SPD was misleading because it stated that a participant's Retirement Plan benefits would be "somewhat reduced" by the value of the participant's Secured Benefit Account. (Pls.' Resp. to Defs.' Mot. to Dismiss Am. Compl. at 9 [Doc. # 68].) They argue that "somewhat" means only to a "small degree or extent" and that a reasonable participant could conclude from this language that the offset would be insignificant. (*Id.*) This argument is disingenuous. First, in cases where a participant's Secured Benefit Account balance is relatively low in comparison to the floor retirement benefit provided by Plan, the offset will be "small." Second, the first definition listed for "somewhat" in Plaintiffs' cited authority is "[t]o some extent or degree," not "to a small degree or extent." *See* http://dictionary.reference.com/ search?= somewhat. Other dictionaries define "somewhat" in a similar fashion. *See Webster's New Collegiate Dictionary* 1099 (Mirriam–Webster ed.1979) (defining "somewhat" as "in some

---

**17.** Unlike prior SPDs, the 2000 Honeywell Retirement Plan SPD set forth the interest rates used to project the Secured Benefit Account forward to retirement age. Plaintiffs argue that this change constitutes a tacit admission that the earlier SPDs violated ERISA. The inclusion of additional details in the 2000 SPD, however, is irrelevant to a determination of whether the earlier SPDs violated ERISA. The issue is whether the pre–2000 SPDs complied with ERISA, not whether a later SPD said more than the statutory minimum.

degree or measure"). Viewed in light of the primary, accepted definition of "somewhat," the SPDs appropriately described the impact of the offset.

Plaintiffs further argue that the 1996 Retirement Plan SPD was misleading because it did not disclose that the Secured Benefit Account would be calculated based on the value of the Account projected to normal retirement age. (Pls.' Resp. to Defs.' Mot. to Dismiss the Am. Compl. at 8–9.) They claim they were misled because the SPD would be offset by the "value of [a participant's] SBA balance" and did not disclose that the value of the Secured Benefit Account balance included interest through normal retirement age. (*Id.*) As discussed above, § 1022 does not require a summary plan description to go into this level of detail. *See Stahl,* 875 F.2d at 1408 (holding that a summary plan description need only provide "information about the general circumstances in which benefits could be lost").

In any event, the 1996 SPD contains more than sufficient detail on this issue. It states that "[t]he calculation for the reduction is complicated and may produce an offset that will eliminate any Retirement Program benefit." (Dauphine Decl. Exh. B at HW0001038.) Further, the 1996 Secured Benefit Plan SPD, distributed at the same time, informed Plaintiffs that if they withdrew their Secured Benefit Account balance before retirement, their offsets would be calculated as if they had remained invested: "If you elect to withdraw your account before retirement ... your pension benefits will be reduced *as if you had withdrawn your Secured Benefit account at retirement.*" (Dauphine Decl. Exh. E at HW0001122 (emphasis added).) Given these statements, Plaintiffs cannot persuasively argue that the SPDs misled them into believing that their Secured Benefit Accounts would not be projected forward to normal retirement age.

Finally, Plaintiffs argue that a Signal Retirement Plan brochure distributed in January 1984 was misleading because it in fact promised that a 3.5% interest rate would be used to project a participant's Secured Benefit Account. First, this argument is effectively moot in light of the Court's ruling on Plaintiffs' anti-cutback claims, which holds that a 3.5% interest rate must be used to project the Account. Second, the brochure is *not* a summary plan description and thus does not fall under the scope of § 1022. *See* § 1022(b) (setting forth twelve requirements for SPDs); *see also Pisciotta v. Teledyne Indus., Inc.,* 91 F.3d 1326, 1329 (9th Cir. 1996) (holding that an insurance booklet describing benefits was not an SPD because it "lacked ten of the required twelve elements set forth in 29 U.S.C. § 1022(b)"). Third, the brochure describes the retirement-age interest conversion factor used to convert a participant's Secured Benefit Account into an annuity, not the "Credited Interest" rate used to project the value of the Account to retirement.

The SPDs challenged by Plaintiffs were not misleading and were sufficiently clear to notify participants that their Retirement Plan benefits would be reduced by the value of their Secured Benefit Accounts.

**b. Defendants Had No Duty to Disclose the 1.25% Minimum Benefit Formula**

■ Plaintiffs also argue that the SPDs violated § 1022 because they did not disclose the 1.25% Minimum Benefit Formula. ERISA, however, does not require a plan administrator to flood participants with information concerning benefits that apply only to other classes of employees. Rather, it requires administrators to limit an SPDs length and complexity so that participants will actually read and under-

stand it. *See Stahl*, 875 F.2d at 1409 ("A summary plan description does no good unless an employee can read and digest it."). As discussed in Section (J)(3) above, Plaintiffs were not entitled to benefits under this formula. Thus, the Defendants were under no duty to disclose it to Plaintiffs. *Cf. Cal. Ironworkers Field Pension Trust v. Loomis Sayles & Co.*, 259 F.3d 1036, 1045 (9th Cir.2001) (finding that defendant did not breach its fiduciary duty by failing to disclose non-material information).

### c. The Secured Benefit Account Offset to the Minimum Benefit Formulas

Finally, Plaintiffs argue that the SPDs failed to disclose that a Secured Benefit Account offset applied to the minimum benefit formulas. This argument is moot given the Court's ruling in Section (J)(2), which holds that an offset does *not* apply to the Minimum Benefit Formulas. In any event, even if an offset does apply, the SPDs adequately disclosed the offset. Question 10 of the 1984 Signal Retirement Plan SPD, for instance, defined a participant's "NORMAL RETIREMENT BENEFIT" as "the larger of one of two formulas." (Dauphine Decl. Exh. A at HW0000988.) Question 14 then described both the basic and minimum benefit formulas, and noted: "Both formulas assume that if you have a GARRETT SECURED BENEFIT ACCOUNT, you transfer the full balance of that account to the Retirement Plan." (*Id.*) It also explained that a participant's "NORMAL RETIREMENT BENEFIT" would be reduced if the participant did not transfer his or her Secured Benefit Account balance to the Retirement Plan. Given this language, the SPDs sufficiently disclosed an Secured Benefit Account offset to the minimum benefit formulas.

### CONCLUSION

On the main issue in this case—whether the Defendants' violated ERISA's anti-cutback rule through certain amendments to the Garrett Retirement Plan—the Court grants summary judgment to the Plaintiffs. On the other financially significant issue—whether a Secured Benefit Account offset applies to the Signal Retirement Plan minimum benefit formulas—the unambiguous terms of the plan do not provide for an offset to those formulas. The failure to provide for an offset may have been the result of imperfect draftsmanship; however, the Court may not rewrite the clear terms of the plan.

Accordingly,

**IT IS ORDERED** that Defendants' Motion to Dismiss the Complaint [Doc. # 15-1] and Motion to Dismiss the Amended Complaint [Doc. # 59-1] are **GRANTED IN PART** and **DENIED IN PART.** The following claims are dismissed with prejudice:

(1) Plaintiffs' nonforfeitability claims, brought under 29 U.S.C. § 1053 (contained in Count II of the Amended Complaint);

(2) Plaintiffs' anti-backloading claims, brought under 29 U.S.C. § 1054 (contained in Count II of the Amended Complaint);

(3) Plaintiffs' claim that the Defendants violated the terms of the Signal Retirement Plan by failing to apply the 1.25% Minimum Benefit Formula (incorporated in Count I of the Amended Complaint);

(4) Plaintiffs' claim the Defendants violated the terms of the Signal Retirement Plan—specifically § 4.10(c)—by failing to apply a 3.5% projection rate to Garrett participants eligible to commence benefits as of December 31, 1983 (incorporated in Count I of the Amended Complaint);

(5) Plaintiffs' claim that the Defendants violated 29 U.S.C. § 1054(h) by failing to provide notice of the amendment of the

Signal Retirement Plan to refer to the "Garrett Division" rather than the "Garrett Corporation" (incorporated in Count II of the Amended Complaint);

(6) Plaintiffs' claim the Defendants violated 29 U.S.C. § 1054(g) by amending the Signal Retirement Plan to refer to the "Garrett Division" rather than the "Garrett Corporation" (incorporated in Count II of the Amended Complaint);

(7) Plaintiffs' claim that the Defendants violated 29 U.S.C. § 1024(b)(4) by failing to timely provide them with copies of benefit calculation worksheets (incorporated in Count IV of the Amended Complaint); and

(8) Plaintiffs' claim that Defendants violated 29 U.S.C. § 1022 by failing to adequately disclose certain information in their SPDs (set forth in Count V of the Amended Complaint).

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Partial Summary Judgment [Doc. # 23–1] is GRANTED IN PART and DENIED IN PART. Plaintiffs are entitled to summary judgment on the following claims:

(1) Plaintiffs' claim that Defendants violated 29 U.S.C. § 1054(g) by amending the Garrett Retirement Plan to retroactively increase the interest rate used to project a portion of participant's Secured Benefit Account forward to age 65 for the purpose of calculating the Secured Benefit Account offset; applying a Social Security offset attributable to years of service worked prior to introduction of that offset; and eliminating the fractional reduction to the Secured Benefit Account offset for participants with more than 35 years of service (incorporated in Count II of the Amended Complaint);

(2) Plaintiffs' claim that the Defendants violated 29 U.S.C. §§ 1054(g) and (h) by amending the Signal Retirement Plan to provide for a Secured Benefit Account offset to the Plan's minimum benefit formulas (incorporated in Count II of the Amended Complaint); and

(3) Plaintiffs' claim that the Defendants violated the terms of the Signal Retirement Plan by applying a Secured Benefit Account offset to the Plan's minimum benefit formulas (incorporated in Count I of the Amended Complaint).

**IT IS FURTHER ORDERED** that, pursuant to Plaintiffs' notice in their Motion for Partial Summary Judgment and Rule 41(a)(1)(i), Plaintiffs' claim pursuant to 29 U.S.C. § 1054(b)(1)(G) is dismissed without prejudice.